# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex. rel.* FLOYD H. WILSON, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No. CV-11-S-3361-NE |
| CRESTWOOD HEALTHCARE, L.P., d/b/a CRESTWOOD MEDICAL CENTER, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Relator, Floyd H. Wilson, commenced this *qui tam* proceeding on behalf of the United States, alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, by Crestwood Healthcare L.P., doing business as "Crestwood Medical Center," Dr. Smita S. Shah, Dr. James Eugene Speed, Dr. Stephen G. Tygart, Dr. Pamela Hudson, and a number of fictional defendants described only as "Does 1-25."[1]  Relator filed his complaint, under seal, on September 16, 2011.  The United States ultimately elected to decline to intervene in the action on January 24, 2012.[2]  The complaint was

---

[1] *See* doc. no. 1 (Complaint) ¶¶ 10, 12-14. See also Part III(E) of this opinion, *infra*, discussing the fact that federal courts do not permit fictitious party practice.

[2] Doc. no. 7.

unsealed on January 30, 2012.[3]   The case presently is before the court on four

motions:  three virtually identical motions to dismiss pursuant to Federal Rule of

Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be

granted,[4] and a motion to strike relator's response to the motions to dismiss.[5]

## I. FACTUAL ALLEGATIONS OF THE COMPLAINT

### A.   Parties

Relator, Floyd H. Wilson, is a Tennessee-based contractor.[6]   Wilson's

contracting company is called "Capital Investors Properties Group, Inc."[7] Defendant

Crestwood  Healthcare  L.P.,  doing  business  as  Crestwood  Medical  Center

("Crestwood"), owns and operates a hospital in Huntsville, Alabama.[8] Defendant Dr.

Pamela Hudson is the Chief Executive Officer of Crestwood, a position she has held

since 2007.[9]   Defendants Dr. Smita S. Shah, Dr. James Eugene Speed, and Dr.

Stephen G. Tygart (the "defendant physicians") are physicians who leased office

---

[3] Doc. no. 8.

[4] Doc. no. 20 (Motion to Dismiss of James Eugene Speed and Stephen G. Tygart); doc. no. 22 (Motion to Dismiss of Smita S. Shah); doc. no. 24 (Motion to Dismiss of Crestwood L.P. and Pamela Hudson).

[5] Doc. no. 30.

[6] Doc. no. 1 ¶ 9.

[7] *See id.* ¶ 62.

[8] *Id.* ¶ 10.

[9] *Id.* ¶ 11.

2

space for their medical practices from Crestwood.[10]

## B. The Corporate Integrity Agreement

Prior to December of 2000, Crestwood was owned by Healthcare Corporation of America ("HCA").[11]  On December 12, 2000, HCA entered into a "Corporate Integrity Agreement" with the Department of Health and Human Services.[12]  That agreement was for a term of eight years.[13]  When HCA sold Crestwood, Crestwood was released from its obligations under the HCA Corporate Integrity Agreement itself.[14]  From that time forward, Crestwood was subject to a supplemental integrity agreement.[15]  Under that agreement, Crestwood was required to

> implement and maintain with respect to its operations . . . an effective program to prevent and detect violations of the legal requirements applicable to the delivery of goods and services in connection with any healthcare benefit and that such program will comply with the provisions of the U.S. sentencing guidelines related to corporate compliance programs and will be mindful of any applicable guidance issued by [the Department of Health and Human Services] and . . . maintain such program for no less than five years . . . .[16]

---

[10] *Id.* ¶ 13.  Defendants note that the physicians, themselves, did not sublease the space, *i.e.*, their medical practices were the actual parties to the agreements.  Doc. no. 21, at 4 n.1.  For the purposes of this motion to dismiss, that distinction is not relevant.

[11] *Cf.* doc. no. 1 ¶ 45.

[12] *Id.* ¶ 35.

[13] *Id.* ¶ 36.

[14] *See id.* ¶ 44.

[15] *Id.* ¶ 45.

[16] Doc. no. 1 ¶ 44 (bracketed alteration supplied).

Crestwood had an affirmative obligation to ensure that its provision of healthcare and its billing policies complied with federal law, and to report any potential violations to the Department of Health and Human Services.[17]

## C.   The Lease Agreements

Crestwood entered into a "Ground Lease Agreement" with relator's development company in 1999.[18]  Relator developed the property for use as the "Vincent Medical Building," and leased the premises back to Crestwood through January of 2011.[19]  Crestwood, in turn, subleased space in that building to the defendant physicians and other medical practitioners.[20]  Relator's complaint focuses on the terms of those subleases.

One of the subtenants was a medical practice called "General Surgical Associates."[21]  Crestwood and General Surgical Associates executed a sublease for a two-year term to commence in November of 2004.[22]  Allegedly, the sublease deliberately understated the area of the demised premises, resulting in a benefit to

---

[17] *Cf. id.* ¶ 43 (describing the affirmative reporting requirement in the HCA Corporate Integrity Agreement).

[18] *Id.* ¶ 62.

[19] *Id.* ¶¶ 53, 62, 65-66.

[20] *See id.* ¶ 65.

[21] Doc. no. 1 ¶ 47.  Presumably, one or more of the  defendant physicians owns that practice, but relator has not actually alleged how General Surgical Associates relates to any of the  named defendants.

[22] Doc. no. 1 ¶ 47.

General Surgical Associates of more than $100,000 over the course of the lease.[23]

The defendant physicians were all subtenants of Crestwood for unspecified periods of time between calendar years 2000 and 2010.[24]  Allegedly, thesubleases all contained terms favorable to them.  They were charged for less square footage than they actually occupied.[25]  They were charged lease rates that were not only below the market rate, but also below the rates Crestwood was paying relator under the master lease, by between $1.00 to $3.00 a square foot.[26]  The subtenants were not required to reimburse Crestwood for their use of Crestwood-owned equipment.[27]

Under the terms of the subleases, the subtenants were supposed to pay Crestwood their share of the operating expenses of the premises as "additional rents."[28]  At the commencement of the subleases, the operating expenses were

---

[23] *Id.* ¶ 48.  The specifics of this transaction, as laid out in the complaint, are nonsensical.  Relator states that the sublease began in November of 2004, and was extended beyond its two-year term, but was terminated in February of 2006, *i.e.*, *before* the end of the initial lease terms.  *Id.* ¶¶ 47-48.  Additionally, he states that the demised premises comprised "4823 square feet of rentable space and 4306 square feet of useable space."  *Id.* ¶ 48.  He then states that General Surgical Associates paid a rental rate based on 4823 square feet of *useable* space, *i.e.*, the area he had previously identified as *rentable* space, and that the actual useable space was 5500 square feet, *i.e.*, and area larger than he initially stated the *rentable* space to be.  *Id.* ¶ 48.

Defendants have not relied on those inconsistencies in framing their arguments in favor of dismissal.  The court highlights them here only as an explanation for the omission of specifics in its statement of the facts, as relator *did* attempt to include specifics in his complaint.

[24] Doc. no. 1 ¶ 50.

[25] *Id.*

[26] *Id.* ¶¶ 50-52.

[27] *Id.* ¶ 50.

[28] *Id.* ¶ 55.

estimated at $3.00 a square foot per month, to be adjusted to reflect rising costs in the future.[29]  Although actual operating expenses for Crestwood rose as high as $6.50 a square foot per month, the subtenants were never charged more than $3 per square foot per month.[30]  Likewise, the subtenants were not required to pay their utility costs, in contravention of the subleases.[31]  Utility costs in comparable buildings over the same time period were greater than $2.00 a square foot per month.[32]  Crestwood's failure to charge utility costs to the subtenants saved them between $18,000 and $27,000 a year.[33]  Additionally, Crestwood did not charge the subtenants the expense it incurred in paying ground lease expenses.[34]  That failure to charge expenses saved the subtenants an additional $100,000.[35]

Crestwood provided custom leasehold improvements in the premises subleased by the defendant physicians.[36]  None of those three physicians was charged for any cost associated with those improvements.[37]  As a result, Shah saved $240,000, Speed

---

[29] Doc. no. 1 ¶ 57.

[30] *Id.*

[31] *Id.* ¶¶ 59-60.

[32] *Id.* ¶ 61.

[33] *Id.*

[34] Doc. no. 1 ¶¶ 62-63.

[35] *Id.* ¶ 64.

[36] *Id.* ¶¶ 72-74.

[37] *Id.*

$260,000, and Tygart $260,000.[38]

## D.   **False Claims**

The final paragraph in the "allegations" section of the complaint states that Crestwood "knowingly and intentionally violated Federal Law" by providing all of the compensation outlined in the complaint in exchange for illegal Medicare and Medicaid referrals from the subtenants.[39]  "Defendants then knowingly submitted false claims to federal and state governments based on referrals from those physicians."[40]  Relator does not identify any particular false claim by date, physician, patient, type of service, or any other indicium.

## II.  **MOTION TO DISMISS STANDARD**

Federal Rule of Civil Procedure 12(b) permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).[41]  This rule must be read together with Rule 8(a),

---

[38] *Id.*

[39] Doc. no. 1¶ 75.

[40] *Id.*

[41] In full text, Rule 12(b) provides that:

Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required.  But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;

(2) lack of personal jurisdiction;

which requires that a pleading contain only a "short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While that

pleading standard does not require "detailed factual allegations," *Bell Atlantic Corp.*

*v. Twombly*, 544 U.S. 544, 550 (2007), it does demand "more than an unadorned, the-

defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, —,

129 S. Ct. 1937, 1949 (2009) (citations omitted).

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [*Twombly*, 550 U.S., at 555]. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id*., at 557.
>
> To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face."

---

(3) improper venue;

(4) insufficient process;

(5) insufficient service of process;

(6) failure to state a claim upon which relief can be granted; and

(7) failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

Fed. R. Civ. P. 12(b).

*Id.*, at 570.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.*, at 556.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Ibid*.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.*, at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly*.  *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)).  Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Id.*, at 556.  Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  490 F.3d, at 157-158.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While *legal conclusions* can provide the framework of a complaint, they must be supported by factual allegations.  *When there are well-pleaded factual allegations*, *a court should assume their veracity and then*

*determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal*, 556 U.S. at —, 129 S. Ct. at 1949-50 (emphasis added).

When ruling upon a motion to dismiss, the court must assume that the well-pleaded facts set forth in the plaintiff's complaint are true. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (1994) (stating that on a motion to dismiss, the court must "accept as true the factual allegations in the amended complaint"); *Marsh v. Butler County*, 268 F.3d 1014, 1023 (11th Cir. 2001) (*en banc*) (setting forth the facts in the case by "[a]ccepting all well-pleaded factual allegations (with reasonable inferences drawn favorably to Plaintiffs) in the complaint as true"). Accordingly, that which is set out in this memorandum opinion as "the facts" for Rule 12(b)(6) purposes may, or may not, be the actual facts. *See, e.g.*, *Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1281 n.1 (11th Cir. 2006).

The pleading standard is heightened in cases involving fraud or mistake. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) serves three purposes:

> First, it deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel *in terrorem* settlements. Second, it protects against damage to professional reputations resulting from allegations of moral turpitude. Third, it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense.

*Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1036 n.25 (4th Cir. 1997) (quoting *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997)). Claims brought pursuant to the False Claims Act are considered fraud claims, and are subject to the pleading requirements of Rule 9(b).  *See, e.g., United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012).

## III.  DISCUSSION

### A.    The False Claims Act, Anti-Kickback Statute, and Stark Statute

The False Claims Act allows private citizens to bring civil actions on behalf of the United States — a so-called "*qui tam* action."  31 U.S.C. § 3730(b).  The person bringing such an action is known as the "relator."  A *qui tam* action does not allege that the relator personally suffered damages.  Rather, the relator prosecutes the action to recover losses suffered by the United States, but is entitled to a share of any damages awarded to the government.  That share ranges between fifteen and twenty-five percent, if the government decides to participate in the prosecution of the case, *or* twenty-five and thirty percent, if the government declines to exercise that option. *See* 31 U.S.C. §§ 3730(d)(1)-(2).

The False Claims Act imposes liability on persons who defraud the federal government.  The statute provides for a civil penalty of between $5,000 and $10,00 to be imposed for each violation, and treble damages for losses actually suffered by

11

the government.  31 U.S.C. § 3729(a)(1).  In relevant part, the False Claims Act imposes that liability on any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
>
> . . .
>
> (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

31 U.S.C. §§ 3927(a)(1)-(3), (7).[42]

Congress has enacted statutory provisions to curtail fraud in the medical industry, particularly with regard to the federally-funded Medicare and Medicaid programs.  The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, imposes criminal

---

[42] In 2009, Congress amended and renumbered sections of the False Claims Act.  Fraud Enforcement & Recovery Act of 2009, Pub. L. No. 111–21, § 4(a), 123 Stat. 1617, 1621–22.  Those amendments do not apply to this case.  *See id.* § 4(f), 123 Stat. at 1625.  Citations herein refer to the False Claims Act as it existed *before* the 2009 amendments.

The amendments to the relevant language of the statute were largely stylistic, and the current version of the statute is not substantially different from the prior version.  The revised versions of the old subsections (a)(1), (a)(2), (a)(3), and (a)(7) appear at subsections (a)(1)(A), (a)(1)(B), (a)(1)(C), and (a)(1)(G), respectively, of the current 31 U.S.C. § 3927.

liability on anyone who, among other things,

> knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind —

>> . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, . . .

42 U.S.C. § 1320a-7b(b)(1).  The statute likewise penalizes those who make payments in return for receiving referrals.  42 U.S.C. § 1320a-7b(b)(2).  Additionally, the Stark Statute, 42 U.S.C. § 1395nn, prohibits hospitals and other medical providers from presenting claims to federal health care programs if those claims are the result of referrals from physicians with whom the hospital has a financial relationship.  *See* 42 U.S.C. § 1395nn(a)(1).

In recognition of the fact that legitimate relationships may exist between hospitals and physicians who practice in or refer patients to hospitals, exceptions and safe harbor provisions were included in both the Anti-Kickback Statute and the Stark Statute.  *See, e.g.,* 42 U.S.C. §§ 1320a-7b(b)(3); 1395nn(e).  Federal regulations outline the requirements which must be met in order to submit a claim to the government, when that claim would ordinarily be barred by the statutes.  *See, e.g.,* 42 C.F.R. § 411.357(a)(4).  Among other requirements, any lease agreement between a

13

referring physician and treating hospital must be made at fair market value, and, be consistent with an arms' length transaction.  *See* 42 U.S.C. § 1395nn(h)(3).

Relator's False Claims Act theory is premised on violations of the Anti-Kickback Statute and the Stark Statute.  He avers that the lease agreements between Crestwood and the defendant physicians were arranged in exchange for patient referrals, and violated both statutes:  *i.e.*, the rent was below market value, violating the Stark Statute, and the reduced rent and other financial benefits constituted remuneration, in violation of the Anti-Kickback Statute.  Thus, he alleges, any Medicare or Medicaid claims arising from referrals from the defendant physicians to Crestwood would be in contravention of federal law and, therefore, fraudulent.  For the purposes of ruling on the motions to dismiss, the court will assume that relator's factual assertions regarding the lease arrangements are sufficient to establish violations of the Anti-Kickback Statute and Stark Statute.

## B.     Relator's Claims

### 1.     Count I

Relator alleges violations of subsections (a)(1) and (a)(2) of the False Claims Act in Count I of his complaint.  The Eleventh Circuit has consistently held that, in order to satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b), a relator bringing an action under to subsection (a)(1) of the False Claims Act must

allege "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (quoting *Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009)). *See also Corsello v Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005); *United States ex rel. Clausen v. Laboratory Company of America, Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002).

"The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen*, 290 F.3d at 1311 (citations omitted).

> Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act. The submission of a claim is thus not . . . a 'ministerial act,' but the *sine qua non* of a False Claims Act violation.

*Id.* (emphasis in original, citation omitted). Thus, the relator must make specific allegations with regard to underlying violations of federal law: *i.e.*, the actions that make the claims submitted to the government fraudulent, *and*, with regard to the *claims themselves*. As the Eleventh Circuit explained in *Corsello*,

> Underlying improper practices alone are insufficient to state a

15

> claim under the False Claims Act absent allegations that a specific fraudulent claim was in fact submitted to the government. *Clausen*, 290 F.3d at 1311.  In short, Corsello provided the "who," "what," "where," "when," and "how" of improper practices, but he failed to allege the "who," "what," "where," "when," and "how" of fraudulent submissions to the government.

*Corsello*, 428 F.3d at 1014.  *See also Hopper*, 588 F.3d at 1326 (ruling that Rule 9(b) was not satisfied when the relator merely piled "inference upon inference" without alleging any particular details about the submission of claims); *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (ruling that a relator's complaint fails "for want of sufficient indicia of reliability" when it merely "portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement").  *Cf. Matheny*, 671 F.3d at 1225 (denying motion to dismiss where "Relators pled specifics relating to the submission of a specific statement in a specific document, submitted by a specific person during a specific review, as required by a particular government contract"); *Hill v. Morehouse Medical Associates, Inc.*, No. 02-14429, 2003 WL 22019936, at *4-5 (11th Cir. Aug. 15, 2003) (denying motion to dismiss where relator provided detailed description of billing process, physicians and patients involved, diagnosis codes, and confidential documents containing additional information).

Actions brought pursuant to subsection (a)(2) of the False Claims Act do not

require allegations that false claims were submitted to the government, because that subsection of the statute lacks the "presentment clause" that is contained in subsection (a)(1). *Hopper*, 588 F.3d at 1327-29 (citing *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008)). Instead, a relator bringing a subsection (a)(2) claim must allege "that (1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim." *Id.* at 1327. "[G]eneral allegations of improper government payments to third parties, supported by factual or statistical evidence to strengthen the inference of fraud . . . could satisfy the particularity requirements of Rule 9(b)." *Id.* (bracketed alteration supplied). However, the *Hopper* court did not reach the question of whether the pleading standard for the "payment clause" of subsection (a)(2) actually is more relaxed than the high standard applied to the "presentment clause" in subsection (a)(1), because the court determined that the relator did not allege that the defendants intended for the government to rely on their false statements. *Id.*

Here, relator has failed to provide, or even to attempt to provide, the "who," "what," "where," "when," and "how" of fraudulent claim submissions to the government. As with the relators in *Clausen, Corsello, Atkins,* and *Hopper*, relator has provided a detailed explanation of the illegal scheme that, he alleges, precipitated false

claims.  But, as with the relators in the *Clausen, Corsello, Atkins,* and *Hopper* cases, he provides no details regarding the submission of any claims.  Relator only makes one statement regarding the actual submission of false claims:  "Defendants then knowingly submitted false claims to federal and state governments based on referrals from those physicians."[43]  With regard to the government actually paying false claims, relator makes a similarly conclusory assertion:  "The United States, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay claims that would not be paid, but for the Defendants' unlawful conduct."[44]  He provides none of the "factual or statistical" support that the *Hopper* court stated *could* be sufficient to plead a violation of the "payment clause."  The allegations in Count I of the complaint, alleging violations of subsections (a)(1) and (a)(2) of the False Claims Act, "do not 'come up short.'  Rather, they do not come up at all."[45]

### 2.   Count II

Relator alleges violations of subsection (a)(3), conspiracy to defraud the United States, in Count II of his complaint.  To state a False Claims Act claim for conspiracy to defraud the government, a relator must show:

---

[43] Doc. no. 1 ¶ 75.

[44] *Id.* ¶ 80.

[45] Doc. no. 21, at 9.

> (1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim.

*Corsello,* 428 F.3d at 1014 (internal quotation and citation omitted). Subsection (a)(3) claims, like those brought under the other subsections of the False Claims Act, are subject to the heightened pleading standard of Rule 9(b). *Id.*

Here, relator alleges that the improper real estate dealings and patient referrals that form the basis of his claims in Count I constitute a conspiracy to defraud the government.[46] Assuming for the sake of discussion that relator sufficiently alleged the first two elements of a conspiracy claim, he failed to allege the third. As discussed in the preceding subpart of this opinion, plaintiff failed to plead that the United States suffered damages in a manner sufficient to satisfy Rule 9(b). Like his claims in Count I, relator's claim in Count II is not sufficiently pleaded.

**3**.   **Count III**

Relator alleges violations of subsection (a)(7) in Count III of his complaint. That subsection is the so-called "reverse false claim" provision of the False Claims Act. To assert a reverse false claim, a plaintiff must allege the existence of five

---

[46] Doc. no. 1 ¶ 85 ("Through the acts described above, Defendants acting in concert with each other . . . conspired to defraud the United States by knowingly presenting . . . false or fraudulent claims . . . .").

elements:

> (1) a false record or statement and (2) the defendant's knowledge of the falsity; (3) that the defendant makes, uses, or causes to be made or used a false statement; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) materiality of the misrepresentation.

*United States ex rel. Mastej v. Health Management Associates, Inc.*, — F. Supp. 2d —, No. 2:11–cv–89–FtM–29DNF, 2012 WL 523623, at *7 (M.D. Fla. Feb. 26, 2012) (citations omitted).

Here, relator has made no specific allegations to support a reverse false claim. Instead, he merely makes a conclusory assertion that defendants "used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the government."[47]   His theory *appears* to be that, under its agreement with the Department of Health and Human Services, Crestwood was required to remit to the government any funds that it received to reimburse false claims.[48]   However, that theory is not specifically developed in the complaint.  In fact, relator "fails to allege any amounts owed to the government by . . . defendants or otherwise provide any other information that puts defendants on notice as to the substance of the . . . claims." *Id.* at *8.  For that reason, Count III fails to meet the requirements of Rule 9(b).

---

[47] *Id.* ¶ 92.

[48] *See* doc. no. 27 (Response in Opposition to Motions to Dismiss), at 7-8.

### C.   Relator's Attempt to Salvage His Complaint

Relator's response brief, filed in opposition to the motions to dismiss, contains over four, full, *single-spaced*, pages of "background."[49]  In those pages, relator sets forth details that were absent from his complaint, citing to numerous exhibits attached to the response.  He provides a more specific account of the events that led to the Corporate Integrity Agreement between HCA and the government, and the sale of Crestwood by HCA.[50]  He also provides more detailed information about the lease agreements between the various parties, and the contracting relationship between his company and Crestwood.[51]  Of significance to the motions before the court, relator cited deposition testimony of the defendant physicians, taken in the course of prior litigation in state court.[52] Dr. Speed testified that he and Dr. Tygart referred roughly half of their patients to Crestwood, and that they provided service to Medicare patients.[53]  Similarly, Dr. Shah testified that she referred patients to Crestwood, and that about 40% of all of her patients received Medicare benefits.[54]  Finally, relator stated that he and Terry Brown, the Chief Financial Officer of Crestwood, had

---

[49] *Id.* at 2-6.  The words "single-spaced" are emphasized because federal courts require that the text of all pleadings be double-spaced.

[50] *Id.* at 2-3.

[51] *Id.* at 3-5.

[52] *Id.* at 5-6.

[53] Doc. no. 27, at 5.

[54] *Id.* at 6.

"ongoing and continuing conversations" about Crestwood's Medicare compliance.[55] Brown allegedly told him that Crestwood "would take [its] chances" on the false claims.[56]

The defendant physicians jointly filed a motion to strike the response, while Crestwood and Hudson filed a reply brief, in which they urged the court to disregard the additional facts.[57]  Relator then filed a response to the motion to strike, in which he requested that he be afforded the opportunity to amend the complaint, should the court find it deficient.

Defendants correctly state that, when evaluating a motion to dismiss premised upon Federal Rule of Civil Procedure 12(b)(6), courts generally does not consider allegations outside of the complaint itself.  *See, e.g., St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002) ("The scope of the review must be limited to the four corners of the complaint.").  There is an exception to that general rule:  *i.e.*, when an extrinsic document is "(1) central to the plaintiff's claim, and (2) its authenticity is not challenged."  *Speaker v. United States Department of Health and Human Services Centers for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

---

[55] *Id.* at 7.

[56] *Id.* (bracketed alteration supplied).

[57] Doc. no. 29 (Reply Brief of Crestwood and Dr. Pamela Hudson); doc. no. 30 (Motion to Strike).

That exception can apply to documents referenced in the complaint, *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009), or submitted by a defendant. *Speaker*, 623 F.3d at 1379.  Thus, relator may rely on the language of the compliance agreements and leases in arguing that his complaint is sufficiently well-pleaded (although it would have been preferable to attach them to the complaint itself).

Nonetheless, the issue of whether relator may properly rely on documents outside the four corners of his complaint is moot.  Even assuming the background information presented in relator's response is true, it fails to elevate the allegations in his complaint to the level of specificity required by the Eleventh Circuit under Rule 9(b).  Relator *still* has failed to allege any false claims with specificity.  The mere fact that the defendant physicians admitted they referred some patients to Crestwood, and had some Medicare patients, falls far short of the "who," "what," "where," "when," and "how" required to satisfy Rule 9(b).  *Corsello*, 428 F.3d at 1014.  Relator's argument that his conversations with Brown provide his allegations with sufficient indicia of reliability is stronger, but still ultimately fails.

Relator relies on two Eleventh Circuit cases:  *Matheny*, and *United States ex rel. Walker v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349 (11th Cir. 2005).[58]

---

[58] Relator also cites an unpublished opinion from the Southern District of Ohio, *United States ex rel. McDonough*, No. 2:08–CV–00114, 2012 WL 628515 (S.D. Ohio February 27, 2012).  The relator in that case, like those in *Matheny* and *Walker*, was an insider, and the court applied a Sixth Circuit pleading standard that is not quite as stringent as that outlined by the Eleventh Circuit.

Relator states that in *Walker*, "the court found the relator's information substantiated by an officer of the corporation."[59]   However, that characterization glosses over a critical fact in *Walker* — the relator in that case was a former employee of the defendant.  *Walker* involved a medical practice that billed Medicare for the full cost of services performed by physician's assistants and nurse practitioners in situations in which it was only permissible to bill for a portion of those services.  *Walker*, 433 F.3d at 1353-54.  The relator based her complaint, in part, on a conversation that she had with one of the defendant's managers.  *Id.* at 1359.  However, that conversation was in the course of the relator's employment with the defendant, in which she also was a firsthand witness to the billing scheme, and was in fact required to participate in it.  *Id.* at 1360.  The *Walker* relator was not a "corporate outsider," *Clausen*, 290 F.3d at 1311, and her conversation with one of the defendant's managers was not the sole source of her knowledge regarding false Medicare claims.

*Matheny* is likewise distinguishable from the case at bar.  Relator relies on *Matheny* to demonstrate that failure to comply with a Corporate Integrity Agreement can constitute a violation of the False Claims Act.[60]   That principle is not in doubt.  Rather, the problem with relator's complaint is its failure to allege with specificity the

---

[59] Doc. no. 27, at 7.

[60] *Id.*

false claims that constituted violations of the agreement governing Crestwood.  In *Matheny*, the relators were former employees of the defendant.  *Matheny*, 671 F.3d at 1220.  One of them was present at meetings where the failure to comply with the Corporate Integrity Agreement binding the company was discussed and the scheme to falsify reports was developed.  *Id.* at 1225-26.  Although he was told of the scheme by officers of the company, those conversations were part of his employment and, like the *Walker* relator, he was required to participate in the scheme.  *Id.* at 1221.  The *Matheny* relators identified the dates of the relevant meetings, and included specific information about accounts for which false Medicare claims were filed.  *Id.* at 1226.

The differences between the specificity of the allegations in *Walker* and *Matheny*, on the one hand, and the case at bar, on the other, are striking.  Perhaps most salient is the fact that, here, relator is a corporate outsider, while in those cases the relators were former employees of the defendants.  There is no requirement that a relator be an employee or former employee, and the Eleventh Circuit has recognized the difficulty an outsider faces in satisfying Rule 9(b).  *See Clausen*, 290 F.3d at 1314 ("We are not unsympathetic to the situation in which Clausen finds himself.  Most relators in *qui tam* actions are insiders.  As a corporate outsider, he may have had to work hard to learn the details of the alleged schemes . . . .").  Nonetheless, a relator, be he an insider or an outsider, still must be able to state the "who," "what," "where,"

"when," and "how" of claims filed with the government. *Corsello*, 428 F.3d at 1014. *See also Clausen*, 290 F.3d at 1314 (stating that the pleading standard is not relaxed for corporate outsiders). Of more legal significance than their status as insiders, the relators in *Walker* and *Matheny* alleged specific details about the filing of fraudulent claims. Relator's bare assertion that claims were filed, and that the Crestwood CFO told him that there were fraudulent claims, does not meet that standard.

**D**.   **Relator's Request for Leave to Amend his Complaint**

Federal Rule of Civil Procedure 15 states that a "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2) (bracketed alteration supplied). "Ordinarily, a party must be given at least one opportunity to amend before the district court dismisses the complaint." *Corsello*, 428 F.3d at 1314 (citing *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001)). The court may disallow amendment, however, "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Id.* When a relator desires to amend his complaint, he must file a motion for leave to amend, and "must either attach a copy of the proposed amendment to the motion or set forth the substance thereof." *Atkins*, 470 F.3d at 1362.

26

Here, relator has not attached a copy of his proposed amended complaint. The additional factual allegations he set forth in his response to the motions to dismiss, however, appear to constitute the substance of his proposed amendment.[61] Defendants argue that amendment would be futile.[62] The court agrees. As discussed in the previous subpart of this opinion, even taking into consideration the additional facts relator set out in his response brief, his allegations fall short of the mandate of Rule 9(b). He "does not profess to have firsthand knowledge of the defendants' submission of false claims." *Atkins*, 470 F.3d at 1359. His attempt to buttress his complaint with extrinsic evidence failed to identify a single false claim. Thus, the court may dismiss the case without allowing him an opportunity to amend his complaint.

### E.      Claims Asserted Against "Does 1-25"

The complaint names various fictitious defendants, stating that those unknown people "have served as admitting physicians, agents, representatives of one and

---

[61] *See* doc. no. 31, at 4.

> [S]hould this court deem it inappropriate or find itself unable to consider, by judicial notice, lease documents referred to in the complaint and testimony of the parties in state court proceedings, under oath, Plaintiff would respectfully request Leave of Court to amend the complaint filed by Plaintiff to further clarify and allege the documents and elements from the Defendants['] sworn statements in the complaint filed by Plaintiff.

*Id.* (bracketed alterations supplied).

[62] Doc. no. 29, at 6-7.

another in the fraud and submission of false and fraudulent claims to the United States."[63]   Federal courts do not allow fictitious party practice.   *See New v. Sports & Recreation, Inc*., 114 F.3d 1092, 1094 n.1 (11th Cir. 1997) ("[F]ictitious party practice is not permitted in federal court.").   Therefore, any claims asserted against fictitious defendants are due to be dismissed.   *See*, *e.g.*, *Wiggins v. Risk Enterprise Management Ltd.*, 14 F. Supp. 2d 1279, 1279 n.1 (M.D. Ala. 1998) (dismissing *sua sponte* fictitious defendants).

## IV.  CONCLUSION AND ORDERS

For the reasons set forth herein, the motion to dismiss filed by defendants Speed and Tygart,[64] defendant Shah,[65] and defendants Crestwood and Hudson,[66] respectively, are GRANTED.   The motion to strike jointly filed by defendants Shah, Speed, and Tygart[67] is DENIED as moot.   It is ORDERED that all claims asserted in this action be, and the same hereby are, DISMISSED with prejudice.   Costs are taxed to plaintiff. The clerk is directed to close this file.

---

[63] Doc. no. 1 ¶ 14.

[64] Doc. no. 20.

[65] Doc. no. 22.

[66] Doc. no. 24.

[67] Doc. no. 30.

**DONE** and **ORDERED** this 18th day of May, 2012.

_____
United States District Judge